UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCHES  )   Misc. Nos. 19-1023M to
AND SEIZURES OF THREE NEOCC    )              19-1027M
ACCOUNTS AND TWO CELL PHONES   )

## AFFIDAVIT/APPLICATION FOR SEARCH/SEIZURE WARRANTS

### I. Introduction

#### A. The Drug Trafficking Organization and the Indictment

I, Keith E. Stamper, Special Agent of the Drug Enforcement Administration

("DEA"), United States Department of Justice, being duly sworn, state as follows:

Search/seizure warrants for three Northeast Ohio Correctional Center ("NEOCC")

accounts (of **Ross LANDFRIED**, **Robert KORBE**, and **Donnell STEWARD**) and for

two cell phones (of **Richard GEORGELOS** and **Krystian ZARATE**) are being sought

as part of an investigation of a Western Pennsylvania Drug Trafficking Organization ("the

Organization"). The Organization has several members who are recidivist convicted felons

who had been recently released from prison or who were serving prison sentences when

they participated in the Organization from 2017 to 2019. Several of the members of the

Organization are linked closely to each other by family, friendship, and geography

(including parts of Allegheny and Beaver Counties). The investigation revealed that

members of the Organization were involved in acquiring multi-kilogram quantities of

cocaine as well as heroin/fentanyl and other controlled substances from interstate as well

as international sources of supply. The investigation further revealed that members of the

Organization served as significant sources of supply throughout the United States for

narcotics mailed and/or smuggled into federal and state prisons, including highly potent synthetic cannabinoids saturated into paper products.

The investigation resulted in the return of an eight-count federal indictment in this district on January 8, 2019. The Indictment charges 27 defendants with committing drug trafficking and money laundering crimes and with engaging in interstate travel and transmissions in aid of racketeering. Twenty-five of the defendants are charged in Count 1 with conspiring from January 2017 to January 2019 to distribute Schedule I, II, and III controlled substances, including 5 kilograms or more of cocaine, 1 kilogram or more of heroin, a quantity of fentanyl, a quantity of para-fluoroisobutyryl fentanyl, a quantity of oxycodone, a quantity of 5F-ADB, a quantity of 5F-MDMB-PINACA, a quantity of FUB–AMB, a quantity of ADB-CHMINACA, a quantity of 4-CN-CUMYL-BUTINACA, a quantity of MMB-CHMICA, and a quantity of buprenorphine.

The 25 defendants charged in Count 1 are (listed ages and locations at time of indictment) Noah Landfried (age 34 of Moon Township), Mario Allen (age 40 at USP-Lee in Virginia), Larry Benavides (age 43 at the Clinton County Jail in Pennsylvania), Dashawn Burley (age 20 of Monroeville), Michel Cercone (age 45 of Sewickley), Ahmad Fletcher (age 26 at FCI-Gilmer in West Virginia), Michael S. Frawley (age 47 of Pittsburgh), Christopher Gahagan (age 35 of Ambridge), **Richard GEORGELOS** (age 34 of Arizona), Nicholas Giammichele (age 34 at FCI-Danbury in Connecticut), **Robert KORBE** (age 49 at FCI-Loretto in Pennsylvania), **Ross LANDFRIED** (age 37 at USP-Lee in Virginia), Sterling Marshall (age 24 at USP-Lee in Virginia), Darren Martin (age 30 of Aliquippa), Harold Novick (age 38 of Ambridge), Paul Nuara (age 51 of Erie), Omari Patton (age 39 at FCI-Fort Dix in New Jersey), James Perry (age 52 of Ambridge), John Ramsey (age 47

at FCI-Ray Brook in New York), **Donnell STEWARD** (age 49 at FCI-Otisville in New York), Quoc Boa Trinh (age 39 at FCI-Otisville in New York), Terrell Williams (age 39 of Pitcairn), Richard Wood (age 39 of Pittsburgh), Shayla Yates (age 38 of Dinwiddie, Virginia), and **Krystian ZARATE** (age 27 of Arizona).

The Indictment charges 9 defendants in Count 2 with conspiring to launder drug trafficking proceeds from January 2017 to January 2019. The nine defendants charged in Count 2 are Noah Landfried, Allen, Benavides, Cercone, Fletcher, **Ross LANDFRIED**, Marshall, Perry, and Yates. The Indictment charges Angelo Williams (age 33 of FCI-Cumberland in Maryland) and Priyanka Kumar (age 32 of Potomac, Maryland) in Count 3 with engaging in interstate travel and transmissions in aid of racketeering from January 2017 to January 2019. In addition, Counts 4, 6, and 7 of the Indictment charge Gahagan with distributing cocaine in September 2017, January 2018, and April 2018; Count 5 charges Benavides with possessing para-fluoroisobutyryl fentanyl and 5F-ADB with intent to distribute in November 2017; and Count 8 charges Noah Landfried with distributing heroin in June 2018.

### B. The Search/Seizure Accounts and Cell Phones

The following are the accounts and cell phones for which search/seizure warrants are being applied for:

(1) **Seizure Warrant for All Funds up to $4,416.97 in the Northeast Ohio Correctional Center Inmate Account of Ross LANDFRIED BOP Register #30359068 ("LANDFRIED NEOCC Account"):** This account is registered to **Ross LANDFRIED**. As established below, following the return of the Indictment, funds in this account were transferred from **Ross LANDFRIED**'s federal Bureau of Prisons ("BOP") inmate account

that was used to receive, retain, and distribute the direct and indirect proceeds of the drug trafficking crimes charged in the Indictment. The funds from the BOP account are listed as a forfeiture item in the Indictment.

(2) **Seizure Warrant for All Funds up to $3,390.59 in the Northeast Ohio Correctional Center Inmate Account of Robert KORBE BOP Register #30222068 ("KORBE NEOCC Account"):** This account is registered to **Robert KORBE**. As established below, following the return of the Indictment, funds in this account were transferred from **KORBE**'s BOP inmate account that was used to receive, retain, and distribute the direct and indirect proceeds of the drug trafficking crimes charged in the Indictment. The funds from the BOP account are listed as a forfeiture item in the Indictment.

(3) **Seizure Warrant for All Funds up to $13,359.55 in the Northeast Ohio Correctional Center Inmate Account of Donnell STEWARD BOP Register #33233007 ("STEWARD NEOCC Account"):** This account is registered to **Donnell STEWARD**. As established below, following the return of the Indictment, funds in this account were transferred from **STEWARD**'s BOP inmate account that was used to receive, retain, and distribute the direct and indirect proceeds of the drug trafficking crimes charged in the Indictment. The funds from the BOP account are listed as a forfeiture item in the Indictment.

(4) **Search Warrant for DEA-Pittsburgh File No. CM-17-0072 Exhibit N-239 (a Samsung Cell Phone) ("GEORGELOS Cell Phone"):** On January 15, 2019, this cell phone was obtained from **Richard GEORGELOS** when he was arrested on the indictment arrest warrant at a border checkpoint when attempting to enter the United States near

Nogales and Rio Rico, Arizona. The **GEORGELOS Cell Phone** was subsequently transferred into DEA-Pittsburgh custody as Exhibit N-239 under File No. CM-17-0072 and is currently in secure law enforcement custody in this district.

(5) **Search Warrant for DEA-Pittsburgh File No. CM-17-0072 Exhibit N-240 (an Apple Cell Phone) ("ZARATE Cell Phone"):** On January 15, 2019, this cell phone was obtained from **Krystian ZARATE** when he was arrested on the indictment arrest warrant at a border checkpoint when attempting to enter the United States near Nogales and Rio Rico, Arizona. The **ZARATE Cell Phone** was subsequently transferred into DEA-Pittsburgh custody as Exhibit N-240 under File No. CM-17-0072 and is currently in secure law enforcement custody in this district.

### C. Affiant Training and Experience

I have been a Special Agent with the DEA since February 2001. I received formal basic agent training at the DEA Academy located in Quantico, VA. I am currently assigned to the DEA Pittsburgh District Office, and have been so assigned since January 2013. Prior to my current assignment, I was assigned to the DEA Cincinnati Resident Office from mid-2009 through 2012. Prior to that I was assigned to the DEA Kabul, Afghanistan Country Office from January 2008 through mid-2009, and to the DEA Cincinnati Resident Office from 2001 through 2007. Prior to that, I attended DEA training at Quantico, VA, and was also a Police Officer for the Chesterfield County Police Department.

I have been involved in many narcotics-related arrests and the service of many narcotics-related search warrants. I have handled cooperating sources of information who were involved in narcotics acquisition and/or trafficking. In addition, I have

reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations, and I have had hundreds of conversations with drug traffickers and users as well as with other law enforcement officers about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.  As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

The investigations in which I have participated have resulted in the arrest and prosecution of individuals in state and federal court who have smuggled, received, and distributed controlled substances, including fentanyl, heroin, cocaine, and synthetic cannabinoids.  I have participated in many investigations in which court-authorized wire and electronic interceptions were utilized.  I have provided sworn testimony about how such wiretap investigations are conducted.

Drug traffickers often use coded language and deceptive linguistic practices when communicating with each other.  I have spent many hours reviewing and transcribing such coded language in preparation for federal indictments and trials.  This process of reviewing and transcribing thousands of intercepted communications between drug traffickers, in conjunction with my other experience summarized above, has confirmed that it is now a common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice call and text message features, nearly simultaneously to communicate with their conspirators.  For example, it is quite common

for a particular transaction to be set up and completed using both voice calls and text messages.

The cell phone, in addition to weapons, is a primary tool of the drug trade. Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business. Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cell phones. The data on current or past cell phones can be particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.

Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

I am aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices. I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

Electronic evidence of drug trafficking can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Simultaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a

file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools.  When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the

ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

I have personally participated in this investigation. I have reviewed information obtained through legal process, such as telephone records, and information obtained through law enforcement and commercial databases. In addition, I have discussed this case with, and reviewed the reports of, other law enforcement officers who have been involved in this investigation or who have investigated members of the Organization in the past. I have also reviewed information provided by informants who are familiar with members of the Organization and/or their conspirators.

This application/affidavit is being submitted for the specific purposes stated herein. I have not, therefore, included every fact known to me concerning this investigation. In addition, it should be noted that the interpretations of communications discussed below are based on the results of this investigation so far, my training and experience, and the training and experience of other law enforcement officers who are involved in this investigation.

## II. Probable Cause

### A. Criminal Records

Several of the members of the Organization continued to engage in large-scale narcotics trafficking despite multiple significant prior convictions and federal and state prison sentences for felony drug trafficking, firearm, and other violent crimes. Some of these members were still under court supervision, such as federal supervised release, and

others were still serving their prison sentences.  Summaries of the criminal records of some of the members of the Organization follow:

* **Ross LANDFRIED**: The prior convictions/sentences of **Ross LANDFRIED** (the brother of Noah LANDFRIED) include a 2010 federal conviction in the Central District of Illinois for a drug trafficking conspiracy.  He was sentenced to 240 months in prison for this conviction.  He was serving his sentence at USP-Lee in Virginia from 2017 to 2019.  Prior to his federal conviction, **Ross LANDFRIED** was convicted in 2004 in the Allegheny County Court of Common Pleas of aggravated assault and sentenced to probation.  **Ross LANDFRIED** was convicted in 2004 in the Beaver County Court of Common Pleas of Criminal Use of a Communication Facility and sentenced to probation.

* **Robert KORBE**: The prior convictions/sentences for **Robert KORBE** include 2010 convictions in this district for conspiracy to distribute at least 5 kilograms of cocaine, felon in possession of a firearm, and mail fraud.  He was sentenced to 300 months in prison for these convictions.  He was serving this sentence at FCI-Loretto in Pennsylvania prior to his federal indictment in 2019.  **KORBE** also has several prior state drug trafficking and aggravated assault convictions.

* **Donnell STEWARD**: The prior convictions/sentences for **Donnell STEWARD** include District of Columbia convictions in or around 2004 for assault with a dangerous weapon, possession of a firearm during the commission of a crime of violence, and armed robbery.  He was sentenced to a combined term of 33 years in federal prison for these crimes.  He was serving this sentence at FCI-Otisville in New York from 2017 to 2019.

* **Noah LANDFRIED**: The prior convictions/sentences of Noah LANDFRIED (the brother of **Ross LANDFRIED**) include a 2010 federal conviction in the Central

District of Illinois for a drug trafficking conspiracy. He was originally sentenced to life in prison for this conviction, but the sentence was thereafter reduced, first to 312 months, and then to 117 months in 2015 as a result of an amendment to the sentencing guidelines that reduced guideline ranges. LANDFRIED was on federal supervised release in the Western District of Pennsylvania throughout much of 2017 to 2019. Prior to his federal conviction, Noah LANDFRIED was convicted in 2004 in the Allegheny County Court of Common Pleas of drug trafficking and sentenced to probation. Noah LANDFRIED was also convicted in 2004 in another case in the Allegheny County Court of Common Pleas of aggravated assault and sentenced to probation.[1]

* James PERRY: The prior convictions/sentences for James PERRY include three 1996 federal convictions for possession of a firearm during a crime of violence, Hobbs Act robbery, and conspiracy to commit Hobbs Act robbery. He was sentenced to 276 months in federal prison for these convictions. He was on federal supervised release in this district throughout much of 2017 to 2019.

### B. March 19, 2018, Evidence from Noah LANDFRIED's Toyota 4Runner

On March 19, 2018, at 1:58 a.m., Pittsburgh Police Officer Joshua Haupt was dispatched to the intersection of Liberty Avenue and 28th Street for a two-vehicle accident. Upon arrival, Officer Haupt observed a Mazda 3, PA registration JYR-6814, on the right side of the outbound lane of Liberty Avenue, and nearby a Toyota 4Runner with PA plate KLY-8773 (subsequently impounded at McGann and Chester Towing in Pittsburgh, PA) that had been wrecked into the building located at 2801 Liberty Avenue.

---

[1] References hereafter to **Ross LANDFRIED** will include his first and last name to avoid confusion about whether the reference is to **Ross LANDFRIED** or to Noah LANDFRIED.

The driver of the Mazda, Martin MAKSIMOV, was seated on the sidewalk and had a head injury. MAKSIMOV stated that he was an Uber driver and had been coming from the Polish Hill section of Pittsburgh. MAKSIMOV stated that he did not remember what happened. The passenger in the Mazda, Christopher MONTANEZ, also had injuries to his head and face, and stated that he was intoxicated and was unsure of what happened to cause the accident. Both MAKSIMOV and MONTANEZ were transported to Mercy Hospital by Medic Units 6 and 9.

Officer Haupt spoke to the 911 caller for the traffic accident, William ALVINO. ALVINO stated that he arrived on scene after the accident occurred and both victims were out of the Mazda already. ALVINO also stated that the Toyota 4Runner had already been abandoned upon his (i.e., ALVINO's) arrival.

There were no occupants remaining with the Toyota 4Runner. Due to the severity of the damage to both vehicles and the injuries to the passengers of the Mazda, Pittsburgh Police Officers searched the area in an attempt to locate the driver and any other occupant(s) of the Toyota 4Runner to render aid to them and to otherwise further the investigation. The driver and any other occupant(s) of the Toyota 4Runner were not located in the area.

Officers reviewed the interior of the Toyota 4Runner in an attempt to identify the owner. A registration document was located inside revealing that the Toyota 4Runner is registered to Noah LANDFRIED. Later on March 19, 2018, Noah LANDFRIED contacted a local police department and reported the Toyota 4Runner as stolen. There are significant reasons to doubt the accuracy of this stolen vehicle report. Among the reasons are the fact that it was involved in a hit-and-run accident and incriminating evidence was

inside the Toyota 4Runner.  A federal search warrant was subsequently obtained for the Toyota 4Runner and the items found inside.

One of the items of incriminating evidence that was found inside the 4Runner is an envelope addressed to Lance Yarbough #33861-068 at the Northeast Ohio Correctional Center, with return address Marvin Miller, Esquire.  On March 19, 2018, Attorney Marvin MILLER was consulted about whether he has ever represented Lance YARBOUGH.  Attorney MILLER confirmed that he does not currently, and has not previously, represented Lance YARBOUGH.  The description of the envelope matches the description of the bogus legal/attorney mail that LANDFRIED and his associates exploited to smuggle narcotics saturated into paper (including into printed court opinions and greeting cards) into prison facilities.

Several envelopes containing such paper items have been intercepted at prison facilities in several states as part of this investigation.  Several of these seized paper items have been lab tested and have been confirmed to contain potent synthetic cannabinoid Schedule I controlled substances.  Some of the paper items in LANDFRIED's 4Runner were also lab tested and were likewise confirmed to contain the potent synthetic cannabinoid Schedule I controlled substances.

Also found inside LANDFRIED's 4Runner were over 10 cell phones and a "Special Mail Open Only in the Presence of the Inmate (26 CFR 560.18)" ink stamper from Staples.  In addition, the 4Runner contained a CVS Pharmacy receipt, dated March 14, 2018, at 3:40 p.m.  The receipt was for the purchase of several greeting cards and reams of paper.

The following additional paper items were also found inside the 4Runner: one box lid for Southworth 8 ½ x 11 inch watermarked resume paper; one yellow cardboard portfolio folder; one cover letter from Marvin Miller, Esquire, addressed to Mr. Lance YARBOUGH #33861-068 at the Northeast Ohio Correctional 2240 Hubbard Rd. Youngstown, Ohio 44505, RE: Lance YARBOUGH Criminal No. 16-228, with 5 printed pages of the Beckles v. United States Supreme Court opinion; one white envelope addressed to Noah LANDFRIED 104 S. Jamestown Rd. Moon, PA 15108, with a return address of **Ross LANDFRIED** #30359-068 USP Lee P.O. Box 305, Jonesville, VA 24263; one yellow letter starting with "Bro"; one yellow letter dated Feb 22, 2018; one white envelope from Lexus of North Hills 15025 Perry Highway Wexford, PA 15090 with Toyota handwritten on the envelope; four white business envelopes; thirteen white 4 x 6 greeting card envelopes; five 4 x 8 sealable envelopes; ten greeting cards with an unknown white substance and purple discoloring; one gray Walmart bag covered in a white substance; one Metro PCS Wireless bag; one white plastic drawstring bag; one white CVS Pharmacy bag; several keychains with keys; and photographs.

### C. LANDFRIED/ZARATE/GEORGELOS Drug Trafficking Connection

I reviewed data from a cellular telephone with number 412-808-6542 that was seized from inside LANDFRIED's crashed 4Runner on March 19, 2018. I analyzed text messages that were stored on the cell phone that were to/from Arizona and Mexico numbers 520-313-0065 (i.e., referred to as "TT5"), 520-245-5907, and 526311867621 (Mexican number). I noted, among other things, the following text messages that were exchanged between LANDFRIED, using the x6542 phone, and **Richard GEORGELOS**, using TT5. It should be noted that **GEORGELOS'** use of TT5 was established not only

by the fact that TT5 is subscribed to someone with the last name of **GEORGELOS** (i.e., Mody **GEORGELOS**) in Southern Arizona (i.e., Rio Rico -- just north of Nogales and the US/Mexico border), but also by flight and hotel records, physical and electronic surveillance, and subsequent wiretapped communications over TT5 as detailed below.

On March 3, 2018 at 12:37 AM (UTC time zone), 412-808-6542 (LANDFRIED) sent an outgoing text message to TT5/520-313-0065; "I'll be in Phoenix on sunday" -- informing **GEORGELOS** and his associates that LANDFRIED would be in Arizona so that it was possible that they could meet in person to confidentially discuss their drug trafficking business.

On that same date, at 12:39 AM (UTC time zone), 412-808-6542 (LANDFRIED) sent another outgoing text message to TT5/520-313-0065; "*Im going to my sisters down there its my moms 70th bday*". It should be noted that Lova LANDFRIED, Noah LANDFRIED's sister, lives in Phoenix, Arizona, and Yolanda LANDFRIED, Noah LANDFRIED's mother, has a date of birth of March 5, 1948.

Less than a week prior to these March 3, 2018, text messages, on February 27, 2018, at 2:55 AM (UTC time zone), 412-808-6542 (LANDFRIED) received an incoming text message from the source of supply who uses the Mexican number 5263111867621; "*Hi family hope you're doing wonderful. I'll be calling you in the morning god bless you love you family.*" -- informing LANDFRIED to expect his call the next morning and disguising their relationship as a loving family relationship.

At 7:14 PM that day (UTC time zone), 412-808-6542 (LANDFRIED) received an incoming text message from **GEORGELOS** using TT5/520-313-0065; "*Good afternoon bro im working on going up there jungle tried to call you*" -- informing LANDFRIED that

16

the source of supply, referred to as "Jungle", tried to call LANDFRIED and indicating

that **GEORGELOS** may be making a supply-trip to Pittsburgh.

On February 28, 2018, at 3:22:27, 412-808-6542 (LANDFRIED) sent an outgoing

reply text message to **GEORGELOS** TT5/520-313-0065; "*Phone was off*" – explaining

that he missed the call from Jungle/the Mexican number because he did not have that

particular phone turned on at the time (and highlighting why Jungle, using the Mexican

number, notified LANDFRIED that he would be calling the next day).

Then LANDFRIED, immediately thereafter (i.e., on February 28, 2018, at

3:22:55), used 412-808-6542 to send another outgoing text message to **GEORGELOS** at

TT5/520-313-0065; "*No need to call tell him lets go on either we talked about*" –

indicating that LANDFRIED did not need to speak with Jungle and that LANDFRIED

was ready to be supplied with narcotics based on what they had previously discussed by

telephone.

Upon reviewing the above text messages about Jungle, etc., I remembered details

from a report on an interview of **Ross LANDFRIED**, Noah LANDFRIED's brother and

former co-defendant, that occurred in 2010 when the LANDFRIED's prior federal

charges were pending in the Central District of Illinois.  It appears that **Ross**

**LANDFRIED** agreed to be interviewed to proffer information in an effort to potentially

provide substantial assistance to law enforcement that could result in more favorable

treatment regarding his federal charges at that time.  During the interview, **Ross**

**LANDFRIED** identified his and Noah LANDFRIED's marijuana source of supply as

"Jungle".  **Ross LANDFRIED** explained that Jungle is Mexican and lives in Nogales and

has a brother who lives in Vail, Arizona.  **Ross LANDFRIED** further explained that

Jungle would send "soldiers" (i.e., workers) to Pennsylvania to conduct his drug business and would not come to Pennsylvania. In addition, **Ross LANDFRIED** stated that, on one occasion, he and Noah LANDFRIED got into a disagreement with Jungle when they were in South Tucson, Arizona, that resulted in Jungle and his workers shooting at the car possessed by the LANDFRIEDs.

Additional text messages stored on LANDFRIED's x6542 phone demonstrate that Jungle sent **GEORGELOS** as his soldier/worker to meet with Noah LANDFRIED in late January 2018. On January 26, 2018, at 7:38 PM (UTC time zone), 412-808-6542 (LANDFRIED) received an incoming text message from Jungle/5263111867621; "*Family he will be there Saturday night 11:30pm*" – referring to **GEORGELOS** flying to meet Noah LANDFRIED and once again disguising their drug-trafficking relationship as a family relationship. At 9:57 PM (UTC time zone) on that date, 412-808-6542 (LANDFRIED) sent an outgoing text message to 5263111867621; "*Ok*"—agreeing to meet **GEORGELOS**.

At 10:00 PM (UTC time zone), 412-808-6542 (LANDFRIED) sent an outgoing text message to another Arizona number/person, 520-245-5907, that he relied on to convey information to Jungle when LANDFRIED could not do so directly via Jungle's Mexican number. The text message stated "*Tell family to call me*" – expressing a desire that Jungle call LANDFRIED.

I obtained subscriber and toll records for this other Arizona number, AT&T cellular number 520-245-5907. Records document the subscriber of the phone as Gabriel **ZARATE** at 6930 S Harrier Loop, Tucson, AZ 85756. AT&T records also listed **ZARATE** as having a billing address of 13585 E Aviara Pl, Vail, AZ 85641. It should be

noted that **Ross LANDFRIED** stated in his 2010 interview mentioned above that Jungle

had a brother who lived in Vail, Arizona. **ZARATE** listed a contact home e-mail address

as "GT_19**ZARATE**@COX.NET". A search in the CLEAR public records database lists

Modesta H. **GEORGELOS** (a.k.a. Mody **GEORGELOS** [note the listed subscriber for

TT5]), Karla **ZARATE** (a.k.a. Karla **GEORGELOS**), and Cynthia Guadalupe SMITH

(a.k.a. Cynthia Gualalupe **ZARATE**) as potential relatives/associates of Gabriel

**ZARATE**.

On January 27, 2018, at 2:37 AM (UTC time zone), 412-808-6542

(LANDFRIED) received an incoming text message from the **ZARATE** phone/520-245-

5907; *"He said r is going to be there at 11:30 where he said".* – informing LANDFRIED

that Jungle said that Richard **GEORGELOS** was going to arrive at the Cleveland, Ohio,

airport at 11:30.

On January 27, 2018, at 7:20 AM (UTC time zone), 412-808-6542

(LANDFRIED) sent an outgoing text message to **ZARATE**/520-245-5907; *"Don't

change no flight I need to see him"* – expressing LANDFRIED's desire to see

**GEORGELOS** for the purpose of a re-supply.

On January 28, 2018, at 4:12 AM (UTC time zone), 412-808-6542

(LANDFRIED) received an incoming text message from **GEORGELOS** TT5/520-313-

0065; *"Bro im here im on flight 1864 this is my phone number".* – informing

LANDFRIED that **GEORGELOS** had arrived at the Cleveland Airport on a particular

flight.

I queried fight #1864 and discovered that Frontier Airlines provided service from

Phoenix, AZ, to Cleveland, Ohio. On May 16, 2018, I prepared and submitted a subpoena

to Frontier Airlines requesting the passenger manifest(s) for flight #1864 between January 27th and 28th 2018. On June 12, 2018, I received the requested January 27th 2018 flight manifest for flight #1864. Frontier Airlines Customer Relations Advocate Beth Zimmerman provided me with the entire manifest listing all the passengers in alphabetical order. I noted the passenger name of Richard **GEORGELOS**, DOB 03/03/1984 departing from Phoenix, AZ at 5:39 PM and arriving in Cleveland, OH at 9:35 PM.

I also prepared and served a subpoena on the Sheraton Cleveland Airport Hotel located at 5300 Riverside Drive Cleveland, OH 44135. It was determined that **GEORGELOS**, the user of TT5/520-313-0065, was staying at this location because of the address provided in the text message exchange between 412-808-6542 (LANDFRIED) and TT5. Hotel records list Charles **GEORGELOS** checking into room 322 at the hotel on January 27, 2018, and checking out on the 28th. The room bill of $138.64 was paid in cash.

On January 28, 2018, at 4:43 PM (UTC time zone), 412-808-6542 (LANDFRIED) sent an outgoing text message to **GEORGELOS** TT5/520-313-0065; "*Out front*" and again at 4:45 PM (UTC time zone) "*Silver suv*" – informing **GEORGELOS** that LANDFRIED had driven from Pittsburgh to pick him up in LANDFRIED's silver SUV. The vehicle registered to Noah LANDFRIED involved in the hit and run crash on March 19, 2018, was a silver Toyota 4Runner SUV.

**D. Richard GEORGELOS in Pittsburgh on June 14, 2018, and June 21, 2018**

Surveillance observations, facilitated by wiretapped interceptions over James PERRY's TT3 cell phone, placed **Richard GEORGELOS** with LANDFRIED and

PERRY in Pittsburgh on June 14, 2018, and June 21, 2018. On June 14, 2018, at 8:39

PM, PERRY using TT3 made an outgoing call to 412-757-5539, which was another cell

number used by LANDFRIED earlier in June as confirmed by agents' familiarity with

the sound of LANDFRIED's voice and corresponding physical surveillance as detailed

below. During the call, LANDFRIED provided PERRY with directions to the Hyde Park

Prime Steakhouse near PNC Park in Pittsburgh. For example, LANDFRIED stated, "its

right down the street from the pirate stadium bro."

LANDFRIED was at that location at that time and wanted PERRY to meet him

there. As confirmed by the context of the call and subsequent surveillance observations,

LANDFRIED wanted PERRY to come to the Hyde Park Steakhouse to pick up and

transport **GEORGELOS** who was with LANDFRIED at the time. At 9:18 PM, GPS

data from TT3 positioned TT3 in the area of Hyde Park Prime Steakhouse located at 247

N. Shore Drive, Pittsburgh, PA 15212.

At approximately 9:21 PM, I established surveillance in the area of Hyde Park

Prime Steakhouse and observed PERRY's maroon Chrysler 200 parked in front of the

restaurant. At approximately 9:34 PM, I observed PERRY, LANDFRIED, a female

named Jennifer PATTERSON, and **GEORGELOS** exiting the front of Hyde Park Steak

House and standing next to the valet podium. I observed valet personnel depart and run to

the valet parking lot.

At approximately 9:36 PM, I observed a Chevrolet SUV bearing Pennsylvania

registration GTZ6797 being operated by the valet attendant. The valet attendant pulled

the Chevrolet SUV to the curb by the front door. I observed PATTERSON enter the

driver's side door. The valet attendant ran back across the street toward the valet parking lot.

At that same time, I observed PERRY, LANDFRIED, and **GEORGELOS** walking toward PERRY's parked Chrysler 200. PERRY entered the driver's seat, LANDFRIED entered the front-passenger seat, and **GEORGELOS** entered the right rear-passenger door. After a couple of seconds, LANDFRIED exited the front-passenger side door and **GEORGELOS** entered the front-passenger side door. I observed LANDFRIED standing in the door-jam engaging in conversation with **GEORGELOS**.

At approximately 9:38 PM, I observed a silver Dodge bearing Pennsylvania registration KSC0034 being operated by the valet attendant and then pulled to the curb near the valet podium.   At that same time, LANDFRIED departed from **GEORGELOS** and entered the front-passenger door of the Dodge. After a brief second or two, LANDFRIED departed from the Dodge and walked to the driver's-side window of PERRY's vehicle. I observed LANDFRIED hand an unknown object to PERRY. LANDFRIED departed from PERRY and entered the driver's door of the Dodge. I observed PERRY's vehicle depart from the front of Hyde Park Steakhouse.

On June 21, 2018, at 9:04 PM, GPS data for TT3 positioned PERRY's phone in the area of the Rivers Casino located at 777 Casino Drive, Pittsburgh, PA 15212. At 9:40 PM, PERRY using TT3 made an outgoing call to 412-452-4034 (user referred to as "Fat Boy"). During the call, PERRY tells Fat Boy that he is eating dinner at Andrew's at the Rivers Casino.  Fat Boy asks PERRY who he is eating with.  PERRY responds by whispering, "the guys bro".  Upon hearing of this call, TFO Harpster and I believed "the guy" PERRY was referring to was **Richard GEORGELOS**.

At approximately 10:10 PM, TFO Harpster established surveillance at the Rivers Casino to locate PERRY and "the guy" in an attempt to confirm he was **GEORGELOS**. At 10:13 PM, TFO Harpster observed PERRY accompanied by **GEORGELOS**. TFO Harpster immediately recognized **GEORGELOS** as the same male who was with LANDFRIED and PERRY at the Hyde Park Prime Steakhouse on June 14, 2018. TFO Harpster conducted foot surveillance of both **GEORGELOS** and PERRY for several minutes. Both individuals were observed walking through the slot machines areas of the casino.

At approximately 10:35 PM, DEA TFO James Price and I established foot surveillance inside the casino. TFO Price and I located PERRY and **GEORGELOS** inside the casino. TFO Harpster obtained assistance from Pennsylvania State Troopers Ed Hermick and Greg Beighey, who are assigned to the River's Casino. Trooper Beighey notified River's Casino surveillance personnel and made them aware of the situation and requested their assistance in providing video surveillance of both individuals during their time inside the casino. Trooper Beighey and Trooper Hermick escorted TFO Harpster to the surveillance camera room where they located both PERRY and **GEORGELOS** playing different slot machines throughout the casino.

At approximately 11:09 PM, casino surveillance reviewed the surveillance footage from earlier that evening and observed both PERRY and **GEORGELOS** enter the casino from the elevators and proceed through the security check point. While proceeding through the checkpoint, **GEORGELOS** was asked for proof of identification to verify his age. **GEORGELOS** provided an Arizona identification card which was

scanned (at 9:07:30 PM) into the system identifying/confirming his identity as Richard **GEORGELOS** - D.O.B; March 3, 1984.

At approximately 1:00 AM, TFO Harpster, through video surveillance, observed PERRY and **GEORGELOS** exiting the casino toward the parking garage. Pennsylvania Attorney General's Office Agent Matt Truesdell and I observed PERRY and **GEORGELOS** walking toward PERRY's maroon Chrysler 200 which was parked on the 5th floor. PERRY and **GEORGELOS** entered the Chrysler 200 and departed the area. TFO Kolin Price, Agent Truesdell, TFO Harpster, and I conducted mobile surveillance of PERRY's vehicle after it departed the casino parking garage.

At approximately 1:20 AM, TFO Harpster observed the Chrysler 200 pull onto the sidewalk directly in front of 1227 State Avenue, Coraopolis, PA. I observed PERRY and **GEORGELOS** exiting the vehicle and PERRY opening the front door of the residence at that address for **GEORGELOS** to enter. PERRY returned to the Chrysler and departed the area. This property was previously identified as being owned by Noah and **Ross LANDFRIED**.

**E. Surveillance of LANDFRIED, PERRY, and Richard GEORGELOS on July 16, 2018**

Physical surveillance agents again positively identified **GEORGELOS** in Western Pennsylvania with LANDFRIED and PERRY in mid-July 2018. Physical surveillance of **GEORGELOS** was assisted by receipt of GPS/E911 location data for TT5/**GEORGELOS**' cell phone. Receipt of the location data started during the first half of July 2018 via a judicial warrant. The TT5 location data revealed that **GEORGELOS** was back in Western Pennsylvania (including in Meadville, Crawford County) with LANDFRIED and PERRY, likely from July 8 to July 16.

On July 16, 2018, physical location data for TT5 revealed that it was in the area of the Super 8 Motel in Grove City, Pennsylvania. At approximately 11:10 AM, physical surveillance agents observed **GEORGELOS** exiting from the Super 8 Motel dragging a roller suitcase and carrying a shaving case and a blue plastic grocery bag. **GEORGELOS** was observed walking down Leechburg Grove City Road alone and then entering a nearby Taco Bell restaurant.

**GEORGELOS** stayed at the Taco Bell for about three hours until he was picked up by LANDFRIED and PERRY in LANDFRIED's Toyota Camry. At approximately 1:54 PM, a physical surveillance agent observed the Toyota Camry being driven by LANDFRIED, with passenger PERRY, pulling into the Taco Bell parking lot. **GEORGELOS** placed his items described above in the trunk of the Toyota Camry and entered the rear seat. The Toyota Camry was observed departing from the Taco Bell. Another surveillance agent observed the Toyota Camry proceed north on I-79 toward Meadville, Pennsylvania.

Between 2:31 PM and 2:44 PM, surveillance agents in Meadville observed the Toyota Camry stop at multiple locations in Meadville. LANDFRIED, PERRY, and **GEORGELOS** were each observed in an around the Toyota Camry at that time. At approximately 2:44 PM, I observed the Toyota Camry depart from McMath Avenue in Meadville. As a result of erratic driving and high speeds, surveillance agents were unable to maintain physical surveillance on the Toyota Camry near Meadville. Physical location data for PERRY's TT3 and **GEORGELOS'** TT5, and assisting physical surveillance agents at the Cleveland Airport, confirmed that LANDFRIED and PERRY drove **GEORGELOS** to the Cleveland Airport for a return flight to Tucson, Arizona.

**F. Text Messages Intercepted over GEORGELOS' Phone/TT5**

As stated above, TT5 is a cellular telephone serviced by T-Mobile with telephone number 520-313-0065 that is used by Richard **GEORGELOS**.  Judicial authorization to intercept communications over TT5 was received on July 6, 2018.  At that time, only authorization to intercept electronic communications (e.g., text messages) was applied for.

On July 12, **GEORGELOS** sent the following text message to 520-273-3867: "What up bolas did you re up" – questioning a customer about whether the customer had been re-supplied with narcotics.

On July 16, **GEORGELOS** texted the following message to 520-954-0277: "Isnt it 530 over there and your already awake hard working young chonch im going to see you tomorrow re up today if you can" – directing a customer in a different time zone to seek to get re-supplied with narcotics and informing the customer when **GEORGELOS** would be there to meet.  **GEORGELOS** then received the following reply text on that same day from that same number: "Yeah what time is it over thier ? I'm going today to re up" – informing **GEORGELOS** that the customer would seek to get re-supplied as directed by **GEORGELOS**.

Also on July 16, **GEORGELOS** had the following text message exchange with the 520-273-3867 number listed above: outgoing from TT5 "Did you re up son"; incoming to TT5 "Yes sir"; outgoing from TT5 "Ku I'll see you saturday or sooner"; and incoming to TT5 "Ku my boy i got some flame flame".  In these text messages, the customer confirmed that the customer had been re-supplied with high-quality narcotics and **GEORGELOS** informed the customer when he would be there to meet the customer, possibly to collect payment for the narcotics.

Later that month, on July 27, 2018, during the early morning (all times herein are Eastern Times unless otherwise specified), **GEORGELOS** used TT5 to have a text message exchange with the user of a telephone with Mexican number 52-631-177-6580 about **GEORGELOS** being back in Southern Arizona and meeting with the user to pay the balance, likely the remaining money for a prior supply of narcotics. The text messages were in Spanish and the following are English translations. **GEORGELOS** texted: "I'm back, do you still need balance?"; x6580 texted to **GEORGELOS**: "Yes put/give me (Balance) please, are you here in Nogales?"; and **GEORGELOS** texted back: "In Rio Rico. I'll put the balance tomorrow.".

**G. Audio and Video Monitoring inside PERRY's Dodge Truck in October 2018**

On October 2, 2018, surreptitious audio/video monitoring inside PERRY's Dodge Truck was authorized via a judicial wiretap order. On October 4, the monitoring equipment was surreptitiously installed inside the Dodge Truck by DEA personnel. Audio communications and video observations were monitored by DEA personnel starting later that day. Several significant audio/video observations in the Dodge Truck were made thereafter.

The investigation revealed a pattern whereby **Richard GEORGELOS** and **Krystian ZARATE**[2] served as Southern Arizona-based conduits between LANDFRIED and "Jungle", LANDFRIED's Mexico/Arizona source of supply for narcotics.

---

[2] **Krystian ZARATE** and **Richard GEORGELOS** are both detained on the WD/PA Indictment referenced above and have been detained since their arrests at the US/Mexico border in January 2019 as detailed herein. **Ross LANDFRIED, Robert KORBE,** and **Donnell STEWARD** are also detained on the WD/PA Indictment referenced above as well as on the federal prison sentences they were serving up to the time of the return of the Indictment.

GEORGELOS or ZARATE would fly to Cleveland and then would be picked up and transported to the Pittsburgh area by LANDFRIED or PERRY.    Thereafter, GEORGELOS or ZARATE would confirm that LANDFRIED and PERRY were ready to receive the next supply of narcotics (i.e., their drug money is ready) and that the supply was available.    Then they would travel to the New Jersey/New York area to pick up the supply and bring it back to Western Pennsylvania.

On October 9, 2018, audio/video monitoring inside PERRY's Dodge Truck revealed that he drove the Dodge Truck to the Cleveland Airport to pick up **Krystian ZARATE** who had arrived that evening on a flight from Arizona.    **ZARATE** was identified at that time through flight records.    He was also identified through surveillance observations of his appearance and then comparison with a known photograph of **ZARATE**.    **ZARATE** is bi-lingual with an address in Southern Arizona near the U.S./Mexico border.

As PERRY was arriving at the Cleveland Airport, he was observed communicating with **ZARATE** via what appears to be a cell phone application of some kind that allows cell phones to be used like walkie-talkies.    PERRY and **ZARATE** had the following exchange about PERRY arriving to pick **ZARATE** up at the airport and where **ZARATE** was at the airport.    Their use of the coded term "family" is quite consistent with LANDFRIED's stored cell phone communications with Jungle and **GEORGELOS** from January and February 2018 using the cell phone with number 412-808-6542 referenced above.

JP:    Family, you hear me?
KZ:    Family, are you at the arrival or the departure?
JP:    Are you outside?
KZ:    Hey I'm outside but I think I'm at the arrival where they check in for the tickets.

JP:      I'm coming right now.

Shortly thereafter, **ZARATE** got into the Dodge Truck and had the following exchange with PERRY.  I am aware based on my training and experience that references by drug dealers to everything being "gravy" or "Gucci" are references to the drug trafficking business being good.

JP:      What's up family? How are you?
KZ:      I'm back.
JP:      What's good brother?
KZ:      That was a long as flight.
JP:      Was it?...Alright family what's up?
KZ:      Everything gravy.
JP:      Everything's Gucci huh?
KZ:      Oh yeah.

Shortly thereafter, PERRY and **ZARATE** discussed when the drugs would be ready for pick up and how ready PERRY and LANDFRIED are to pick them up.  PERRY questioned **ZARATE** about how much they could be supplied with and expressed a desire to receive even more than the last time.

JP:      So how long we lookin?
KZ:      Maybe uhh tomorrow.
JP:      Tomorrow? They're gonna be there tomorrow? Awe that's good, we're ready.
KZ:      Uh yeah.
JP:      We're ready.
KZ:      He said he's gonna let me know tonight.
JP:      Oh good, what number?
KZ:      Just made it in time.
JP:      No I'm saying what number.
KZ:      Yeah, yeah he hasn't told me. But we'll know soon. Hope it's on the ups and ups.
JP:      Yeah I hope better than it will be the last time.
KZ:      As long as they're consistent that's all I care.
JP:      Yeah that's good but I mean yeah so whatever I'm saying but the number it will be better, you see how fast we did...
KZ:      I love it, it's amazing.
JP:      Especially now that they waited, a little while, they're ready.

Later that evening, PERRY and **ZARATE**, while still in the Dodge Truck, discussed the drug supply trip they expected to take together, likely to the New Jersey/New York area, and a prior trip they took there together. They took this prior trip together in late September 2018 in PERRY's Cadillac as established through contemporaneous and subsequent intercepted communications and GPS location data for one of PERRY's cell phones. Intercepted communications revealed that PERRY damaged the Cadillac during the trip and thereafter invested some of his drug trafficking proceeds into repairing it.

As PERRY and **ZARATE** discussed their prior trip while they were in PERRY's Dodge Truck on October 9, they expressed regret that, during the prior trip, they did not get to check out some other locations/sights that they wanted to see. PERRY then made the following statement which highlights that the impending trip they were discussing would be, first and foremost, a drug trafficking business trip – "I mean I know we have to take care of what we have to take care of first, but after that's over with."

After PERRY picked up **ZARATE** at the Cleveland Airport, he transported **ZARATE** to Western Pennsylvania. PERRY first took **ZARATE** to Beaver County where I observed **ZARATE** enter and exit a Wal-Mart while PERRY was parked out front. PERRY then took **ZARATE** to his 243 Maplewood Avenue, Ambridge, PA, residence for a short time. PERRY then drove **ZARATE** to a house at 632 Woods Run Avenue in Pittsburgh and dropped **ZARATE** off at that location. It should be noted that the Woods Run house was for sale at that time and may not have had anyone residing there at that time.

The next day, October 10 at approximately 3:00 p.m., a physical surveillance agent observed LANDFRIED's Toyota Camry parked in front of the Woods Run house. The

agent then observed LANDFRIED and **ZARATE** exit from the Woods Run house and enter the Toyota Camry. LANDFRIED and **ZARATE** then left the area in the Camry with LANDFRIED driving.

Four days later, on October 14, during the early evening, PERRY and LANDFRIED had a conversation inside the Dodge Truck during which LANDFRIED told PERRY that the re-supply was not going to occur as quickly as they thought. After LANDFRIED entered the Dodge Truck, he told PERRY that it wasn't going to be here for nine days. LANDFRIED explained that something happened at the border. LANDFRIED and PERRY then discussed taking **ZARATE** back to the Cleveland Airport.

The next day, October 15, the interaction of PERRY, LANDFRIED, and **ZARATE** was monitored inside the Dodge Truck as they drove to the Cleveland Airport to drop off **ZARATE** for a return flight to Arizona. PERRY drove with LANDFRIED as his front passenger and with **ZARATE** in the back seat of the extended cab Dodge Truck. During the trip, LANDFRIED reached over the back seat and handed a plastic grocery bag to **ZARATE**. Subsequent conversation between them indicated that the bag contained several thousand dollars as pre-payment for part of a shipment of narcotic pills that **ZARATE** intended to supply LANDFRIED through the mail after **ZARATE** returned to Arizona.

In reference to the bag that he had just handed to **ZARATE**, LANDFRIED told **ZARATE**, "Family, put that in your luggage. Take it out that bag. Cause, eh, eh, you can't see it, it's just gonna be in there with your clothes." Shortly thereafter, LANDFRIED instructed **ZARATE** on how to package and handle the money and the pills so that no fingerprints or DNA are left on them and so that they are not detected during transit.

NL: Remember now, you just touched that with your fingers, I think I did too, so wipe that off once you seal it alright.!
KZ: Alright
NL: Make sure you wipe it off.
KZ: I will.
NL: You always do it anyways, I showed you how to do it anyways, you just get those Lysol wipes…
KZ: Yeah.
NL: Take one out and just wipe both sides and ah, put it in ah…you know you got to buy them little bubble yellow envelopes too…
KZ: Exactly.
NL: Alright. You know the whole process, vac seal (smacks hands together), bubble ah…mylar…(smacks hands together) bubble envelope, stick it right in there.  You don't gotta glue that top, that seal is good, when you pull that strip off that Priority Mail…
KZ: Yeah
NL: Just seal it even if it is a little lumpy, it's gonna seal…and remember when you go to vac seal them, keep it flat, keep-em flat (LANDFRIED showing **ZARATE** with hand movements on the center console) like see here's your thing, your vac seal, keep the pill flat so it lays like a square…
KZ: Right.
NL: You know what I mean, remember that, just flatten them out and just hold them down when you do it, do it on a table…
KZ: Alright.
NL: You know what I mean, it don't matter if there is extra plastic, as long as you got it flat on the table, when you (inaudible) it flat. Couple of them are gonna get crushed, it don't matter though.

Later on during the trip to Cleveland, LANDFRIED told PERRY, "We got a lot of fucking money to collect, I got to stop at (inaudible) I'm gonna call him right now…" (LANDFRIED is observed with his phone in his lap area).  Thereafter, LANDFRIED returned to instructing **ZARATE** on how to package and handle the envelopes with the narcotic pills before he sends them to Pennsylvania.

NL: (LANDFRIED turns down music) Family. Once you put the pills in, you seal it up, take your gloves off, wipe that thing down, then put the Mylar on alright…
KZ: Alright.
NL: Remember that, always change your gloves, wipe it boom, next layer, wipe it boom, next layer.

Later during the trip to Cleveland, LANDFRIED and PERRY attempted to convince **ZARATE** to hook them up with additional Mexican sources of supply and not

be so loyal to **ZARATE**'s family connection.  LANDFRIED and PERRY emphasized the

volume of narcotics they are capable of distributing.

NL: Sinaloa…
JP: I'm telling you bro, this is a big opportunity over here…
NL: Yeah…get it while it is gettin good, it's the streets always telling, that's why I was always like, work for other people, I was working out of Tucson and still just waiting on Pops, working over here, waiting on Pops, he don't understand how it is, like I still got those Texas dudes coming, like that's just what it is, it's just not enough, what the fuck is twenty, that's nothing…
JP: Nothing, were going through a hundred and fifty a month…
NL: Yeah.
JP: Easily
KZ: I am just faithful to my Dad, you know what I mean,
NL: No I know…
KZ: (Inaudible)
NL: Bro, I know, listen I know that, I'm just saying, you got to talk to him…
KZ: (Inaudible) to my Dad…
JP: (Laughs)
NL: No, that's it…yeah, you can't talk to, I can hear him now telling…Junior we are with these people and that's it! I can hear him now, you know how many times I use to argue with him, I use to argue with him for hours, I use to go down there for two weeks and argue with him, like come on what the fuck are you doing? I even told him, I said, I know how he is, he is comfortable with something and he's sticking with it, he don't understand like what I'm capable of and what he got. He don't!  He got to step his fucking game up. I already know this is your grandfather already got some people too cause Richy was telling me that he is said something like, he was talking to your grandfather and he said he could get something put up here or some shit.

LANDFRIED then returned to the subject of being supplied narcotic pills by

**ZARATE** to hold them over until the main re-supply of narcotics is available.

LANDFRIED further instructed **ZARATE** on how to package and send the pills and

LANDFRIED explained how he intended to send the money to **ZARATE**.

NL: Well at least we'll get this going bro, we'll get this little side hustle going, pay some bills.
KZ: That's all I want.
NL: Remember what to say in the, in the ah…thing bro. Just put sandwich alright.
KZ: Yeah.
NL: When you actually send it. I'ma say the same thing, when I send the bread out, I'm do it Priority, I'll package everything tonight cause we won't get back till late and the mail

will already be gone, so it'll leave first thing in the morning.  Shoot it out first thing in the morning at 9.  Yeah, even if we do this, you know, twice a week or something…
KZ: That be beautiful.
NL: Yeah, hell yeah.

After **ZARATE** got out of the Dodge Truck and went into the Cleveland Airport

for his flight, LANDFRIED and PERRY discussed their desire to be supplied with even

more narcotics than they already were and their hope that **ZARATE** will take their advice

about being disloyal to family and cutting out a family member to increase their profits.

NL: Junior got plugs, they all got plugs, their just too loyal to that little fucker man, at all of my times dealing with him…
JP: How do we get out of here? Same way?
NL: Listen, I only found (yes straight, same way) I only found one guy that would cut him out.  Nobody ever cuts him out, he always sends his close, close family, you know that.  Nobody will cut him out. (LANDFRIED whispers)…"His dad, his dad"…
JP: Who Junior?
NL: Hell yeah, Jacko man…Jacko's Dad.
JP: Oh.
NL: He knows me,
JP: Don't matter bro, they ain't giving us enough, twenty ain't shit! You know (snaps his fingers) like this.

Later on during the ride back to Western Pennsylvania, PERRY and LANDFRIED

discussed the $6,000 that was in the bag that LANDFRIED gave to **ZARATE** as an initial

payment for the pills.

JP: So it's six grand you gave him? That's gonna get what?
NL: Nah, that's just a start up, I gotta mail the rest when I get back.

**H. Arrests of ZARATE and GEORGELOS at the US/Mexico Border with Their Cell Phones**

On January 15, 2019, at approximately 3:47 p.m., **ZARATE** was apprehended at

the Nogales-Deconcini Port of Entry (Nogales, Arizona) by U.S. Customs and Border

Patrol agents.  **ZARATE** was apprehended after he entered the Port of Entry on foot from

the Mexican side of the border.  A "look out" had been placed for **ZARATE** and

**GEORGELOS** as a result of the return of the Indictment and the outstanding arrest warrants. **ZARATE** was in possession of the **ZARATE Cell Phone** at the time of his arrest. **ZARATE** and the **ZARATE Cell Phone** have remained in secure law enforcement custody since that time. Both were subsequently transported to this district.

Also on January 15, 2019, at approximately 6:35 p.m., **GEORGELOS** was apprehended at the Nogales-Deconcini Port of Entry (Nogales, Arizona) by U.S. Customs and Border Patrol agents. **GEORGELOS** was apprehended after he entered the Port of Entry on foot from the Mexican side of the border. **GEORGELOS** was in possession of the **GEORGELOS Cell Phone** at the time of his arrest. **GEORGELOS** and the **GEORGELOS Cell Phone** have remained in secure law enforcement custody since that time. Both were subsequently transported to this district.

### I. Distribution of Controlled Substances Saturated into Paper into and inside Prisons

As noted above, Noah LANDFRIED, James PERRY, and their associates also produced paper saturated with toxic controlled substances, including fentanyl and synthetic cannabinoids, and distributed the paper into and inside federal prisons. The paper was often in the form of bogus "legal" mail disguised as coming from attorneys, photographs often of random women, and greeting cards. Noah LANDFRIED saturated the paper with the controlled substances, dried the paper, printed on the paper to make it look inconspicuous, and then sent it to certain inmates for re-distribution inside prisons. **Ross LANDFRIED, Robert KORBE**, and **Donnell STEWARD** are three of the inmates who received the paper and re-distributed it inside the prisons, generating thousands of dollars of proceeds in the process.

After the mail reached the receiving inmates inside the prisons, the paper was further distributed by the internal high-level dealers to lower-level dealers and sometimes directly to internal consumers. The sheets of paper or greeting cards were often cut into ID-card sizes and then the ID-card quantities were further reduced into very small squares for the purpose of re-distribution and eventual consumption by smoking or chewing. One sheet of paper or greeting card can produce several thousand dollars of proceeds for dealing inmates. Many prisons throughout the country have been very negatively affected by the internal distribution and consumption of controlled substances in this manner.

The problems created have ranged from serious medical events endured by officers after incidental exposure to the saturated paper, to overdoses suffered by inmates after consumption, to clashes between groups of inmates triggered by erratic behavior induced by consumption. In addition, the distribution of the controlled substances within the prisons has allowed incarcerated drug dealers to keep dealing, thereby gaining elevated status within the prisons and making it more likely that they will continue dealing when released. The distribution of the controlled substances within the prisons has also severely hindered attempts to address the drug addictions of certain inmates while incarcerated, thereby making it more likely that they will continue to abuse controlled substances when released.

Distribution of the saturated paper within the prisons does not only allow the internal dealers to gain status, it also allows them to generate internal prison wealth for themselves and external wealth for their associates on the outside. The internal prison wealth is sometimes in the form of commissary items or postage stamps which serve as

currency inside prisons. The internal prison wealth is also in the form of funds in the dealers' prison accounts or in the prison accounts of other conspiring inmates.

Review of prison records during the investigation has revealed a remarkable amount of funds – thousands of dollars over relatively short periods of time – being transferred from the accounts of certain inmates to their associates and conspirators on the outside. It is worth noting that even those inmates who are working prison jobs are not able to generate thousands of dollars for their accounts during such short time periods because of the quite limited compensation they receive in prison wages. Review of prison records indicates that the average balance in the accounts of the majority of inmates is less than $1,000, but the average balance for prisoners like **Ross LANDFRIED**, **Robert KORBE**, and **Donnell STEWARD** was several thousand dollars.

The transfer of the proceeds and payments for the saturated paper to, within, and from prisons is facilitated through wire transfers, often via Western Union and MoneyGram. The wire transfers are often conducted by conspiring external associates of those inmates who are dealing the paper in the prisons and who need funds moved to either pay their internal or external sources of supply or to enjoy the fruits of their dealing. The facilitating wire transfers are often between an external associate, such as a family member, of one inmate and a similar external associate of another inmate. For example, a friend or family member of a lower-level drug dealing inmate wires money to a friend or family member of a higher-level drug dealing inmate for the saturated paper provided by the higher-level inmate to the lower-level inmate. Or the friend or family

member of a drug-dealing inmate wires money to the inmate's external source of supply, or to his nominee, as payment for the supply.

The drug-dealing inmates enjoy the fruits of their dealing through the transfer of proceeds to their prison accounts or to the prison accounts of assisting inmates who have agreed to allow their accounts to serve as less conspicuous funnel accounts for the dealing inmates. They also enjoy the fruits of their dealing through the transfer of funds from BOP inmate accounts to their conspiring friends and family on the outside. This is often done via BP-199 funds transfer requests filed by inmates directing the transfer of funds from their inmate accounts to external parties. The BP-199 forms completed by inmates contain unverified explanations for why the funds should be sent to the external parties. For example, a drug-dealing inmate who wants to transfer proceeds to a family member or to an external source of supply can provide a false explanation on a BP-199 request, such as "gift" or "child support", and can have the funds transferred via a Treasury-type check sent to the family member or source of supply or to a nominee of the source of supply.

### J. Ross LANDFRIED NEOCC Account

Records for the federal BOP inmate account of **Ross LANDFRIED** have been reviewed as part of this investigation. The sheer quantity of funds that were in the account is remarkable. For example, as of November 2018, there was $4,799.41 in **Ross LANDFRIED's** BOP account. The average daily balance in the account for the preceding 6 months was $5,394.62.

What is also remarkable is that the account activity included thousands of dollars of debits from the account after **Ross LANDFRIED** arrived at USP-Lee in July 2017 as well as thousands of dollars of deposits sent by people from all over the United States. For

example, the BOP records indicate that, between October 11, 2017, and December 14, 2017, **Ross LANDFRIED** sent over $3,000 from his inmate account to his brother Noah LANDFRIED in $450 increments. The sub-$500 increments are significant because inmate requests for the issuance of a check of more than $500 have to be reviewed and approved by facility management.

Between October 11, 2017, and January 5, 2018, USP-Lee inmate Kenneth Lawson sent over $2,000 from his inmate account to Michel CERCONE. Most of the over $2,000 was sent in $450 and $425 increments. There is no known connection between Lawson and Michel CERCONE other than Lawson was a fellow inmate at the time of **Ross LANDFRIED** at USP-Lee and Michel CERCONE is a co-defendant and close associate of both Noah LANDFRIED and **Ross LANDFRIED**.

Bogus "legal" mail saturated in controlled substances was seized at USP-Lee shortly after **Ross LANDFRIED** arrived at that institution and continued to be seized thereafter. For example, an envelope addressed to the LANDFRIED's co-defendant Sterling MARSHALL was intercepted at USP-Lee in August 2017. The envelope was made to appear as if it was sent from a Pittsburgh criminal defense attorney who no longer represented MARSHALL. The paper inside the envelope was lab tested and confirmed to contain 5F-MDMB-PINACA which is a potent Schedule I controlled substance.

Information received from BOP personnel at USP-Lee, as well as from an inmate at USP-Lee, revealed that, after **Ross LANDFRIED** arrived at USP-Lee, he and MARSHALL teamed up to assault another prisoner. The assault was a result of a dispute **Ross LANDFRIED** had with the other prisoner over the narcotics paper **Ross LANDFRIED** was supplying. **Ross LANDFRIED** and MARSHALL were housed in the

same general part of the USP-Lee compound. They were able to have contact with each other.

Review of MARSHALL's BOP inmate financial account reveals that he received several thousand dollars into the account during the months after **Ross LANDFRIED** arrived at USP-Lee. He also sent significant quantities of funds out of his account during that time period. For example, from mid-September 2017 to the end of November 2017, MARSHALL sent over $2,500 out of the account. The funds were sent to Elise KLAVON in Pittsburgh – one of Noah LANDFRIED's girlfriends at the time and a close friend of **Ross LANDFRIED** as confirmed by letters sent by **Ross LANDFRIED** from USP-Lee during 2018.

Connections between the LANDFRIEDS and MARSHALL were also established by reviewing emails sent and received by MARSHALL using his BOP email account and by reviewing text messages that were on one of the cell phones that were found inside Noah LANDFRIED's wrecked Toyota 4Runner in March 2018. It should be noted that there are services that will convert BOP emails into text messages that can be received by clients on the outside. The services will also convert text messages from clients on the outside into emails into BOP prisoner email accounts. The services often mask who the prisoner is sending messages to or receiving messages from further undermining BOP efforts to maintain security inside the institutions.

On November 27, 2017, MARSHALL received an "email" stating the following: "4128086542 Yo whats good give this number to bro". On December 1, 2017, MARSHALL replied with the email "i gat u bro we been locked down you mite be able 2 finess it b4 me doe".

40

One of the cell phones that was found in Noah LANDFRIED's wrecked Toyota 4Runner in March 2018 had the same 412-808-6542 number assigned to it. Review of the data on that particular cell phone revealed a text message sent from the phone on November 27, 2017, that matches the November 27 "email" MARSHALL received that is reproduced above. The cell phone also contains a "text message" from MARSHALL that matches the December 1 email he sent that is reproduced above. It is apparent from this rather surreptitious exchange of text messages/emails that the LANDFRIEDS trusted MARSHALL to share sensitive information with him and that Noah LANDFRIED was clandestinely communicating with **Ross LANDFRIED** through MARSHALL and through other means.

The pending Indictment not only charges **Ross LANDFRIED, KORBE**, and **STEWARD** with drug trafficking crimes, it also expressly seeks forfeiture of "all funds in the federal Bureau of Prisons ("BOP") inmate financial accounts of . . . **ROBERT KORBE** (BOP Register #30222068), **ROSS LANDFRIED** (BOP Register #30359068), . . . and **DONNELL STEWARD** (BOP Register # 33233007). . . ." The Indictment also seeks forfeiture of the gross proceeds acquired by **Ross LANDFRIED, KORBE**, and **STEWARD** and forfeiture of any substitute assets possessed by them if the funds in the BOP inmate accounts have been transferred, diminished, or commingled. As explained below, following the return of the Indictment, **Ross LANDFRIED, KORBE**, and **STEWARD** transferred the funds in their BOP accounts to their NEOCC accounts.

At the time of the return of the Indictment in January 2019, a federal seizure warrant was obtained for the funds in **Ross LANDFRIED**'s BOP account. The seizure warrant

was served on USP-Lee.  Confirmation was thereafter received that the funds in the account were frozen based on the seizure warrant.

Ross **LANDFRIED** was transported to this district following the return of the Indictment.  He has been housed at NEOCC pending trial.  BOP personnel subsequently provided notice that a mistake was made by the BOP after Ross **LANDFRIED** was transferred to NEOCC.  The funds in Ross **LANDFRIED**'s BOP account were transferred in error to his NEOCC Account despite the seizure warrant.  Review of NEOCC records for Ross **LANDFRIED**'s NEOCC Account reveals that $4,416.97 was transferred from his BOP Account into his NEOCC Account via a U.S. Treasury check on April 19, 2019. We are only seeking a seizure warrant for funds up to the amount of this U.S. Treasury check.

### K. Robert KORBE NEOCC Account

Records for **Robert KORBE**'s BOP account reveal that, from January 2018 to January 2019 leading up to his federal indictment, $2,685 was deposited into his BOP account by various people in three different states (these funds are in addition to the funds that were deposited into **KORBE**'s account for "payroll").  Additional BOP records reveal that, from June 2018 to December 2018, **KORBE**'s account balance swelled by more than $1,000, reaching a balance in excess of $3,000.  Evidence generated by the investigation of **KORBE** reveals that, by June 2018, **KORBE** was being supplied with narcotics-saturated paper products by co-defendant James PERRY and was re-distributing the paper inside FCI-Loretto where **KORBE** was located.

A letter found inside James PERRY's Ambridge residence on January 10, 2019, (during the service of a search warrant following the return of the Indictment) demonstrates

**KORBE**'s drug-trafficking relationship with PERRY.  The envelope for the letter was post-marked in June 2018.  The envelope was falsely addressed to a female at James PERRY's address, but, as reflected by the screenshot of the letter below, the letter was for James "Jimmy" PERRY from Robert "Bobby" **KORBE**.   The letter also includes **KORBE**'s instructions for how PERRY should send the narcotics paper so that it is not intercepted by BOP security on its way to **KORBE** through one of **KORBE**'s inmate associates.



The next month (July 2018), BOP security personnel at FCI-Loretto reviewed mail that **KORBE** sent that was addressed to his father, but that included a letter inside that was clearly intended to be forwarded to James PERRY.  The letter instructs PERRY on how to inconspicuously send a greeting card saturated with narcotics into FCI-Loretto and actually provides PERRY with the script of what to write inside the card to make it seem like it was sent from a female named "Jen" who misses **KORBE**.  The letter

also reflects how **KORBE** manipulates the funds in his BOP account to avoid having the

balance get too high (e.g., he funnels funds through his account – BOP records show that

**KORBE** did send $300 to his father between July 2018 and November 2018).

This is a screenshot of the letter:

This is a screenshot of the script that was included with the letter:



BOP security personnel made a copy of **KORBE**'s letter and script, but did not prevent them from being mailed out.   The next month (August 2018), BOP security personnel at FCI-Loretto intercepted a narcotics-saturated greeting card that was prepared by PERRY and sent according to the instructions and the script provided by **KORBE**.  The greeting card was subsequently tested at the DEA Lab and was confirmed to contain potent synthetic cannabinoid controlled substances.

The following script was written inside the greeting card as if it was sent from "Jen":



The BOP security personnel replaced this greeting card with another similarly-worded greeting card (that contained no controlled substances) and forwarded it on to **KORBE**.  During the next month (September 2019), BOP security personnel reviewed another letter from **KORBE** to PERRY.  The letter reveals that **KORBE** distributed the replacement greeting card inside FCI-Loretto, but received a complaint because it was not

"that strong". **KORBE** advised PERRY to send the next time what PERRY sent **KORBE**

in the past.


This is a screenshot of part of the letter:

**KORBE** was transported to this district following the return of the Indictment. He has been housed at NEOCC pending trial. Review of NEOCC records for **KORBE**'s NEOCC Account reveals that $3,390.59 was transferred from his BOP Account into his NEOCC Account via a U.S. Treasury check. The funds were deposited into his NEOCC Account on March 12, 2019. We are only seeking a seizure warrant for funds up to the amount of this U.S. Treasury check.

### L. Donnell STEWARD NEOCC Account

From 2013 to 2019, **Donnell STEWARD** was an inmate at FCI-Otisville in New York. Noah LANDFRIED was also an inmate at FCI-Otisville leading up to the time of his release from BOP custody in early 2017. Review of **STEWARD**'s BOP account records reveals that, after LANDFRIED was released from BOP custody and started supplying narcotics paper to **STEWARD** and others, **STEWARD**'s BOP account balance increased dramatically. The balance went from less than $300 in January 2017 to over $13,000 by early 2019. Between 2017 and 2019, thousands of dollars were deposited into **STEWARD**'s BOP account by various people from over 15 states throughout the United States.

**STEWARD** was transported to this district following the return of the Indictment. He has been housed at NEOCC pending trial. Review of NEOCC records for

**STEWARD**'s NEOCC Account reveals that on March 19, 2019, $13,359.55 was transferred from his BOP Account into his NEOCC Account via a U.S. Treasury check. We are only seeking a seizure warrant for funds up to this amount.

After his arraignment on the Indictment in this district, **STEWARD** transferred $9,600 from his NEOCC account to an associate named Toni KING. NEOCC records demonstrate that on March 20, 2019, **STEWARD** directed that $9,600 be withdrawn from his NEOCC Account and sent to Toni King. On the form **STEWARD** completed to request the withdrawal, there is a section titled "Explain reason for the request". In this section, **STEWARD** stated, "To save for me."

Noah LANDFRIED's supply of narcotics paper to **STEWARD**, and **STEWARD**'s corresponding generation of proceeds from re-distributing the paper, was revealed, in part, through review of the data on one of the cell phones that was found in LANDFRIED's wrecked Toyota 4Runner in March 2018.[3] The cell phone was assigned number 412-871-1674. The cell phone contains communications between **STEWARD** and LANDFRIED for a few months leading up to the March 2018 car crash. It appears that emails from **STEWARD** were converted to text messages to the LANDFRIED x1674 phone using a conversion service as explained above. The first text message on the LANDFRIED phone from **STEWARD** contains a statement from the conversion service stating that it was from DONNELL S.

Review of communications between FCI-Otisville inmates/co-defendants Nicholas GIAMMICHELE, Quoc Boa TRINH, and LANDFRIED in 2017 revealed their use of

---

[3] There was an envelope found in the 4Runner that had **Donnell STEWARD**'s name on it as the intended addressee at FCI-Otisville.

references to females as code for the narcotics paper that LANDFRIED was sending to them at FCI-Otisville.  After BOP security personnel at FCI-Otisville recognized the significance of this female code, they intercepted a bogus legal mail envelope in April 2017 that was addressed to TRINH.  The paper in the envelope was subsequently lab tested and confirmed to contain potent synthetic cannabinoid controlled substances.

The **STEWARD**/LANDFRIED communications on the x1674 LANDFRIED phone contain similarly coded female references that were used in an attempt to disguise their discussion of the narcotics paper LANDFRIED was supplying **STEWARD**.  For example, on December 30, 2017, **STEWARD** sent the following message to LANDFRIED likely asking how much LANDFRIED would charge for the next round of narcotics paper he would send to FCI-Otisville: "Happy New Year to u as well! we all had a good time and u know i got my bitch back.LOL!!!  thank U 4 all tht U do.i might need u to get her a gift 4 me. Find something nice and tell me the cost she deserve it! stay up and stay OUT!!!"

The next day LANDFRIED replied with the following message likely indicating what the cost would be and conveying the name and address of one of LANDFRIED's female associates for **STEWARD** to have part of the proceeds sent to: "Just spend like 200 on her she is a nasty freak I'm gonna tell her to get even nastier next u talk to her she told me give u her address Jennifer Patterson 1730 Maine ave West mifflin,PA 15122".  It should be noted that, from January 2018 to May 2018, three different federal inmates sent a total of $1,950 to Jennifer PATTERSON at the 1730 Maine Avenue address.

On January 4, 2018, **STEWARD** sent the following message to LANDFRIED likely indicating that some of the narcotics paper that LANDFRIED sent was not as potent as prior paper according to **STEWARD**'s customers: "what's up Moe, how r u doing? I'm

good:) just checking in. bout to go talk to my new bitch.she not like my other 1s,not as strong and she hard hard headed as fuck! LOL!!! stay up and stay OUT!".

One week later, on January 11, 2018, **STEWARD** sent another message to LANDFRIED likely explaining that **STEWARD** sent some of the proceeds from distribution of the paper to a relative who would then send to LANDFRIED or one of his associates: "what's up Moe, how r u doing? I'm good:) just checking in.  i sent my mom some money 4 u and butch.she will call u when it get's there! they took it off my books 2 days ago so it should b soon.thts y'all Christmas presents:) stay up and stay OUT!!!".  BOP records establish that, on January 9, 2018, **STEWARD** sent $300 to Sandra STEWARD in Maryland.

Later that month, on January 25, 2018, LANDFRIED sent the following message back to **STEWARD**: "Listen your people never gave me her name I asked she said I don't need it so I figured I just get it from u so I don't hassle her".  Later that same day, **STEWARD** replied, "her name is Sandra".

Contemporaneous communications between LANDFRIED and others found on the same x1674 phone provide context for LANDFRIED's communications with **STEWARD**. For example, LANDFRIED exchanged several communications with a female, who had a close associate who was incarcerated, about supplying the female with narcotics paper she could then re-distribute to her associate.  On February 18, 2018, the female informed LANDFRIED that things had become more complicated because the location where her male associate was housed "just went on lockdown".  The next day, LANDFRIED asked about how much narcotics paper the female wanted to be supplied with: "How many papers do u want me to send".  The female answered, "I was told it would be 50" – referencing 50

pages of narcotics paper.  The female followed this message up with another similar message the next day: "I will still need the 50 pages".  LANDFRIED replied about a week later with a message indicating that he would supply the narcotics paper, but not 50 pages of it at that time: "Also 50 takes a lil while I'm gonna get u started with less".

LANDFRIED communicated with another female on the x1674 phone who also had an incarcerated male associate.  On December 30, 2017, LANDFRIED sent the following text message likely in an effort to obtain money from the female for narcotics paper that had been supplied to the female's associate who was incarcerated with **Ross LANDFRIED** in Virginia: "Hi I'm calling about your people Virginia".  On January 5, 2018, the female replied with the message, "Sorry for delay.  Haven't talked to mark yet. The whole place has been on lockdown and mark is being transferred.   No info yet. Kristine".  LANDFRIED replied the next day with a message directing the female to have her incarcerated male associate check with **Ross LANDFRIED** about the amount of money she owed Noah and **Ross LANDFRIED** for the narcotics paper they supplied: "Ask him about Ross and the amount".  Later that month, on January 26, the female texted Noah LANDFRIED, "Ok I got the green light.  Will take care of this tomorrow.  Sorry for delay" – notifying him that the payment would be sent soon.  The next day, Noah LANDFRIED sent the following message to the female directing her to have her incarcerated male associate contact **Ross LANDFRIED** to discuss another supply of narcotics paper: "Ok thanks let him know my bro said look out for him so let me know if he wants what my bro

had once he takes care of this".

Keith E. Stamper
Special Agent -- DEA

Sworn and subscribed before me
this 7th day of May 2019.

UNITED STATES MAGISTRATE JUDGE